Opinion delivered March 9, 1889.

## No. 2715.

## CLAY BROWN v. THE STATE.

1. RAPE—"FORCE"—CHARGE OF THE COURT.—Rape by force, as defined by article 528 of the Penal Code, is carnal knowledge of a woman, obtained by force, without her consent. "Force," as used in the said article, is such force as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case (Penal Code, art. 529), and upon a trial for rape by force it devolves upon the trial court to give in charge to the jury such statutory definition of "force."

2. SAME—ASSAULT TO RAPE.—To constitute the offense of assault with intent to rape by force, the offender must have committed an assault or assault and battery upon the female with the specific intent to rape by force, and the force thus intended must be such force as might reasonably be supposed to overcome resistance, taking into consideration the relative strength of the parties and the other circumstances in the case; and on a trial for assault with intent to rape by force the trial court must so instruct the jury. But see the opinion of Willson, Judge, dissenting from the ruling of the majority of the court, and holding that, though to constitute the offense of assault with intent to rape by force, the assault must be accompanied by the specific intent to rape by force, the character of the force intended is immaterial, and that it is not the duty of the trial court, upon a trial for assault with intent to rape by force, to give in charge to the jury the definition of "force," as prescribed by article 529 of the Penal Code.

APPEAL from the Criminal District Court of Galveston. Tried below before the Hon. C. L. Cleveland.

The conviction in this case was for an assault with intent to rape Katie Ford, in Galveston county, Texas, on the first day of October, 1888. A term of seven years in the penitentiary was the penalty assessed against the appellant.

Katie Ford was the first witness for the State. She testified, in substance, that she was fourteen years old, and on the first day of October, 1888, resided with her mother and her sister Alice in the city of Galveston. She and her mother and her said sister retired on the night of the said day, occupying the same bed. Between one and two o'clock, at which time she was thoroughly awake, she felt a heavy pressure on her body, and remarked to her mother that there was a box on her. At that instant a hand clutched her throat, and her sister Alice exclaimed: "There is a black hand around her neck!" The defendant was then on top of witness, his knees pressing on her stomach, one hand on her thigh, and the other clutching her throat. Witness's mother, when Alice uttered the exclamation above stated, raised up in bed, when the defendant sprang out of the bed, off the witness, and fled towards the front door. Just before reaching the front door, he ignited a handful of matches to enable him to find the door, opened it and ran out, followed by the witness and her mother. The house stood in a yard, the front of the said house being about ten feet from the front gate. The moon was shining brightly on that night. On getting out of the house, the witness and her mother looked in front for the defendant, but saw no person. Witness's mother then went into the back yard through the back gate, leaving the witness near the gate in front. Within a very short time after witness's mother passed through the back door, the defendant, in rapid flight from the back yard, passed the witness at a very short distance, and ran out at the front gate. The witness, her sister and mother pursued him as far as the neighboring corner of the street, the latter exclaiming: "Fire! Murder! Help! Catch Clay Brown!" By the time the witness, her mother and sister got back to the house they found a number of persons, who had been attending a dance across the street, collected in front of the house. The witness stated that she was well acquainted with the defendant. Defendant had frequently caught the family horse for the witness, her mother or sister, and on such occasions would come into their yard. While in the said yard about two weeks before the assault upon witness, the defendant, while being

passed by witness, remarked to her: "Some how, I like you all mighty well." Witness did not respond to this remark of the defendant, but pursued her way to the house. Witness had never had sexual intercourse with any man.

Cross examined, the witness denied that on the night of, and soon after the attempted outrage upon her, she told Mr. Potts that she did not know who assaulted her, and that she did not know whether the man was white or black. As a matter of fact she and her mother both knew who the man was, and that he was Clay Brown, this defendant, and her mother, knowing the assailant of the witness to be the defendant, cried, as she pursued him: "Catch Clay Brown!" The witness did not learn from Ada Dodds that Clay Brown was the man who assaulted her, and she had never talked with Ada Dodds on the subject of this assault.

Mrs. Ford, the mother of the prosecuting witness, testified for the State that she occupied the same bed with her daughters on the night of October 1, 1888. She did not rest well that night, in consequence, perhaps, of a dance that was in progress in a house nearly opposite to hers on the same street. Between twelve and one o'clock Alice related a dream she had had, when witness advised her to go to sleep. Some time afterwards, the witness not yet having gone to sleep, Katie remarked to witness that a big box was pressing on her. Alice exclaimed: "There is a big black hand around her neck!" Witness raised up in bed, when a man sprang off the bed and ran towards the door. He struck several matches together, opened the door and ran out. Witness followed, and, failing to see him out the front way, turned and looked into the back yard, where she saw and in the clear moon light recognized the defendant, who was pulling up and buttoning his pants. As soon as he saw witness he fled from the yard through the front gate, passing the witness's daughters at a very short distance. Witness and her daughters pursued the defendant as far as the nearest corner, the witness exclaiming: "Fire! Murder! Help! Catch Clay Brown!" When she and her daughters returned to the house, they found a large number of persons collected before the gate, to whom she reported what had occurred.

On her cross examination the witness denied that she told the several parties collected in front of her gate that she did not know the party who assaulted her daughter, and did not know whether he was a white or a black man. She made no such

statement to Mr. Potts. She did know who the man was, and, in giving the alarm, she did not merely cry murder! and fire! but, as well, "Catch Clay Brown!" The witness never told Mrs. Jones nor any other party that she did not know who the man was. Ada Dodds did not tell the witness that the man was Clay Brown. The witness told her son that if he did not go to the police headquarters at once—that very night—and file complaint against defendant, she would go herself. Thereupon her said son left to go to the said headquarters. The testimony of Alice Ford was circumstantially the same as that of her mother and sister.

The State rested.

Julia Rhodes testified, for the defense, that the defendant came home about seven o'clock on the night of the alleged assault on Katie Ford. He at once complained of feeling unwell. About eight o'clock on the same night, Bob and Mary Anderson and Eddie James came to the house, and about half past eight o'clock the said parties and the witness and defendant went into the business part of the city for a walk. They entered but one store, in which the defendant purchased a shirt and a pair of shoes. They got back to the house about half past ten o'clock. Bob and Mary Anderson and Ed James left about half past eleven o'clock, when witness and defendant went to bed. About half past twelve o'clock Mr. Solomon knocked at the door. Defendant got up and went to the door in his underclothes, opened the door and talked to Mr. Solomon, who had come to collect some money for playing music at a recent birthday party given by defendant and witness. After Solomon left, the defendant came back to bed and remained in bed, without leaving it, until next morning.

S. A. Solomon testified, for the defense, that he resided in Harris county, and was in attendance upon this trial as an attached witness for the defense. About twelve o'clock on the night before he left Galveston, soon after the defendant gave a birthday party, the witness went to defendant's house to collect his pay for playing the music at said party. The defendant came to the door in his night clothes, complained of being unwell, talked with witness awhile, and went back to bed.

John Q. A. Potts testified, for the defense, that he lived with his mother in the house next to, but separated by a half lot from, the house of the Fords. The lattice gallery of the witness's house faced the Ford house. About one o'clock on the

night of the alleged assault the witness was awakened by the cry of "fire! murder! thief!" Running out of his house to the sidewalk, the witness met Mrs. Ford and her daughters, who told him that a man had been in their house. Witness asked if it was a white or a black man. Mrs. Ford, in the presence and hearing of her daughters, replied that she did not know who it was. About that time a man whom witness did not know stepped forward and said: "It was a white man dressed in black, and he ran off down the alley." (This statement of the witness as to the declaration of the stranger, was stricken out by the court, and the defense excepted.) Soon afterward two ladies came from across the street from the direction of the house in which a ball was in progress, and one of them laughingly asked, "Why didn't you catch him?" Mrs. Ford heard the stranger say that the man who had been in her house was a white man, and did not deny or dispute the statement. Witness's mother was present and heard the conversation between witness and Mrs. Ford, as detailed above. On the following Monday morning, being the morning set for the examining trial of the defendant, the witness heard an angry altercation on Mrs. Ford's gallery between Mrs. Ford and her son, in the course of which he heard the son say to Mrs. Ford: "I am not going to court this morning to swear to a d—d lie for you nor anybody else." On the morning after the alleged assault the witness heard Katie Ford say: "Oh, we've got him! Mrs. Dodds said she just knew it was Clay Brown!"

On his cross examination, this witness said that he did not know whether or not he, witness, had a strain of negro, nor whether he was white or black.

Mrs. Potts, for the defense, corroborated her son as to the conversation between her said son and Mrs. Ford, just after the latter gave the alarm by crying "Fire! Murder! Thief!" If Mrs. Ford cried "Catch Clay Brown!" witness did not hear her. She also corroborated John Potts as to the altercation between Mrs. Ford and her son on Monday morning, when her son said: "I am not going to court to swear to a d—d lie for you or anybody else."

Mrs. Ford and Kate and Alice Ford, for the State, in rebuttal, adhered to their previous testimony in detail, and denied, seriatim, the statements testified to by J. Q. A. and Mrs. Potts. Mrs. Ford particularly denied that she talked or quarreled with her son about his testimony on the examining trial of the de-

fendant, or that her son made any such statement as that con-tained in the testimony of the Pottses.

Mr. Ford testified, in rebuttal, that there was not an atom of truth in the testimony of the Pottses to the effect that he and his mother had a dispute about his testimony on the examin-ing trial of the defendant. He was never spoken to by his mother about his testimony on that trial, before it occurred, and he made no such statement to his mother as that testified to by Mrs. and J. Q. A. Potts.

Police Officer Moran testified, for the State, that complaint against the defendant for assaulting to rape Katie Ford, was filed at public headquarters between two and three o'clock on the morning of the alleged assault.

*W. L. Wilson,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. This conviction was for an assault with in-tent to rape. As presented by the facts, an issue in the case was the intention of the appellant: Did he intend to have car-nal knowledge of Katie Ford *by force* or with her consent?

The indictment alleges that the assault to rape was by force, threats and fraud. Threats and fraud are eliminated from the case because there is no proof of either. The State's case, then, is an assault with intent to rape *by force*, and to warrant con-viction the evidence must show force, and this force must be of a certain character, viz: "Such as might reasonably be sup-posed sufficient to overcome resistance, taking into considera-tion the relative strength of the parties, and other circum-stances of the case." (Article 529, Penal Code.) This article constitutes a part of the definition of rape or assault to rape when force is relied on for conviction. Make this provision a component part of article 528, Penal Code, and we would have this definition of rape: Rape is the carnal knowledge of a woman without her consent obtained by such force as might reasonably be supposed sufficient to overcome resistance, tak-ing into consideration the relative strength of the parties and the other circumstances of the case.

An assault with intent to commit rape is constituted by an assault or assault and battery with intent to have carnal knowl-edge of the female by the use of such force as might reasonably

be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case. To be guilty of this offense the accused must have intended to accomplish his purpose by the use of this character of force. This proposition is absolutely correct; for, if his intention falls short of this, it would be impossible for him to be guilty of an assault with intent to rape. Because we have seen (threats and fraud not being in the case) that to constitute rape such force must be actually used. Therefore the conclusion is inevitable that, to be guilty of an assault with intent to rape, the accused must have intended to use such force; it being impossible for him to intend to rape without intending to do that which constitutes rape. These propositions are self-evident, demonstrating their inherent infallibility. The authorities are harmonious on this question. Mr. Bishop says: "An attempt is committed only when there is a specific intent to do a particular criminal thing, which intent imparts a special culpability to the act performed toward the doing. It can not be founded on mere general malevolence. When we say a man attempted to do a thing, we mean that he intended to do, specifically, it, and proceeded a certain way in the doing. The intent in the mind covers the thing in full; the act covers it only in part." [Sec. 731, 1 Bishop's Criminal Law.)

And the same author, in section 731, says: "The offender's purpose must be to commit an entire substantive crime; as, if the alleged offense is an assault with intent to commit rape, he must, to be guilty, have meant to use force, should it be necessary, to overcome the woman's will."

And again, in section 745, Mr. Bishop says: "There must, in the words of Cockburn, C. J., 'be an attempt which, if successful, constitutes the full offense.' There can be no doubt of the soundness of this doctrine. We have seen that, in law, a man does not intend to commit a particular offense if the act he intends would not, when fully performed, constitute such offense "

The conclusion from all the authorities is that nothing short of the specific intent to commit the substantive offense will . answer. And in rape, and in assault with intent to commit rape, the party can not be said to intend to commit the substantive offense unless he uses or intends to use all such force as is necessary to overcome all resistance. And unless the jury are so charged, the charge will fail to inform them as to what is required to constitute the substantive crime.

In rape under the circumstances all resistance must be overcome. In assaults to rape the accused must intend to overcome all resistance, and in passing upon the question as to whether the accused, in either rape or assault with intent to rape, did in rape, or intended to use in assault to rape, such force, relative strength of the parties, and all other circumstances must be looked to. In the substantive offense, rape, such force must be used. In the intended offense such force must have been intended; and if such force was intended, it will matter not that the accused did not have the ability to overcome resistance in fact. The assault, with intent by force (that force defined in article 529, Penal Code), to have carnal knowledge of the woman, is the test; and if these exist and concur the offense is complete. Just what facts and circumstances are sufficient to show an intention to resort to such force can never be enumerated; each case must depend upon its own circumstances.

The court below failed to define force. This should have been done, because article 529 is a part of the definition of rape, and for this reason enters into and constitutes one of the elements of assault with intent to rape.

The judgment is reversed and the cause remanded for another trial.

WILLSON, JUDGE. I do not assent to the proposition that in a prosecution for assault with intent to commit rape, it is essential for the court to charge that the force intended to be used must be such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case. Such character of force is necessary to constitute rape by force, and in a prosecution for that offense it is essential that the court should so instruct the jury. (Penal Code, art. 529; Jenkins v. The State, 1 Texas Ct. App., 346; Jones v. The State, 10 Texas Ct. App., 552.) I do not think that article 529 of the Penal Code, defining the force necessary to constitute rape, applies or was intended to apply to an assault with intent to commit rape.

Our code provides that "An assault with intent to commit any other offense is constituted by the existence of the facts which bring the offense within the definition of an assault, coupled with an intention to commit such other offense, as of

maiming, murder, rape, or robbery." (Penal Code, art. 506.) This seems to be the view entertained by this court in Carroll v. The State, 24 Texas Ct. App., 366.

According to my understanding of the statute, if a man assaults a woman with the specific intent to have carnal connection with her by force, against her will, he commits the offense of assault with intent to rape. The assault is the use or attempted use of force, and the *intent* requisite to constitute the crime is not an intent to use the force contemplated in article 529, supra, or any specific character of force, but is an intent to forcibly and against the will of the woman have carnal connection with her. The force intended to be used by the assaulting party may not be such as might reasonably be supposed would be sufficient to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case; yet, if there was an assault, and the assaulting party intended to ravish the woman, or at least to make the attempt to do so, taking the chances of being able to accomplish his design, I think he would be guilty of an assault with intent to rape.

To illustrate: A man meets a woman in daylight in a city on a public street, in the presence of hundreds of people. He is a small, delicate man; she is a large, athletic woman. He assaults her and attempts to throw her down, and the evidence conclusively shows that his intent is to have carnal knowledge of her without her consent. He could not reasonably suppose that he could overcome her resistance or that the people present would allow him to accomplish his design, yet he may unreasonably believe that perchance he can succeed, and may make the effort under such unreasonable belief, willing to take the chances of the venture. Would he be guilty of an assault with intent to rape? I think he would, but, under the opinion of a majority of the court, as I understand it, he would not be guilty of that offense. It is with deference and hesitation that I dissent from the opinion of the court, which opinion, I concede, is supported by authority. My dissent is founded upon articles 503 and 506 of our Penal Code, and with reference to which article 529 has no connection or applicability, in my opinion. I think the charge of the court in this case was unobjectionable, and that the conviction should not be set aside upon the ground of the insufficiency of said charge.    *Reversed and remanded.*